HARRY W. MARDEN, as Trustee, v. THE ELKS CLUB, a Florida Corporation, *et al.*

190 So. 40
Division B
Opinion Filed June 23, 1939

*Charles J. Schuh* and *B. M. Skelton,* for Appellant;

*Bussey, Mann & Barton,* for Estate of R. H. Thomas, deceased, and *Carey & Harrison,* for Estate of S. E. Doane, deceased, for Appellees.

BROWN, J.—This appeal brings for review a final decree of foreclosure, in which it was held, in effect, that bondholders who had not exchanged their original bonds for refunding bonds were entitled to priority in payment out of the proceeds of the foreclosure sale over bondholders who had exchanged their original bonds for refunding bonds.

The bill of complaint filed in this case by Harry W. Marden, as trustee, shows that on May 1, 1923, the Elks Club of St. Petersburg, Florida, a corporation, for value received, executed and delivered to the American Bank & Trust Company, as trustee, 360 first mortgage gold bonds aggregating $130,000.00 maturing May 1, 1933, bearing 8 per cent interest, and subject to redemption after November 1, 1925, and secured by a deed of trust on certain real estate owned by the Elks Club of St. Petersburg, together with all and singular the rights, easements, tenements, hereditaments and appurtenances thereunto appertaining, and all rents, issues, profits and income from the property, including all fixtures, furnishings and furniture which might be placed in the building or buildings on said property. Of this original issue, bonds to the amount of $10,000.00 were

redeemed and cancelled. On April 30, 1930, the American Bank & Trust Company, the said trustee, closed its doors and has since then failed to function; and on September 26, 1930, the Central National Bank & Trust Co., by order of the Circuit Court, was appointed substitute trustee. Thereafter it was discovered that the Elks Club of St. Petersburg was unable to pay interest on its outstanding bonds or make any further redemption of them, and so on May 1, 1930, the Elks Club of St. Petersburg entered into a supplemental deed of trust with the Central National Bank & Trust Co., as substitute trustee, by which said indebtedness was to be refunded with a new issue of 336 first mortgage Class "B" bonds aggregating $120,000.00, maturing May 1, 1940, which were similar to the old bonds except as to the date of maturity, which was extended seven years, and the interest rate, which was reduced from 8 per cent to 6 per cent. The principal amount of the indebtedness has, as above noted, been reduced from $130,000.00 to $120,000.00 before the refunding bonds were issued.

The refunding bonds were delivered to the trustee to be exchanged at par, bond for bond, with the original bonds, $120,000.00 of which were still outstanding. All of the original bonds were surrendered and exchanged for refunding bonds except $6,600.00 owned as follows: J. V. Ridgley, $100.00; E. W. Jewett, $1,000.00; Estate of S. E. Doane, $5,000.00, and R. H. Thomas $500.00. It was alleged that the purpose of the refunding bonds was to create no new indebtedness, but merely to extend the maturity date of the principal and reduce the interest rate from 8 per cent to 6 per cent. It is alleged that the refunding bonds under the supplemental trust deed, which encumbered the same property as the original trust deed, are on a parity with the bonds still outstanding under the original trust deed except as to interest. On April 16,

1931, the Central National Bank & Trust Company became defunct, and on April 21, 1932, the Circuit Court appointed Harry W. Marden as trustee, under both the original and supplemental trust deeds.

On December 19, 1935, interest on the refunding bonds being in default, and holders of more than 25 per cent of the outstanding bonds having requested the substitute trustee to accelerate the maturity date of the principal, Harry W. Marden, as trustee, acting under the powers conferred by the original and supplemental trust deeds, filed a bill of complaint against the Elks' Club of St. Petersburg, Florida, and the holders of bonds of the original series that were never exchanged for refunding bonds, praying that a receiver be appointed to take charge of the property (abandoned by the Elks Club on September 1, 1935, by moving out and taking certain movable property with them), that the said mortgage or trust deeds be foreclosed, that a deficiency decree be entered in case the property does not bring sufficient to satisfy all claims, and that plaintiff, as trustee, may become a bidder at the sale for the benefit of the bondholders.

R. H. Thomas and L. M. McGouirk, as administrator of the Estate of S. E. Doane, deceased, filed separate answers to the bill. The principal defense asserted by each answer is, substantially, that the bonds issued under the supplemental deed of trust are secondary and inferior to those issued under the original deed of trust; and that the bonds secured by the original deed of trust are entitled to be first satisfied because of their first lien on the property, which lien is superior to that represented by the refunding bonds secured by the supplemental trust deed. Some of the material allegations of the bill were admitted and some denied by each. The answers prayed that the bill of complaint be dismissed or that the court appoint a substitute trustee with

power to foreclose the original trust deed, either in this or in a separate action.

R. H. Thomas died, and the cause was revived in the name of Ida Thomas Wilson, as administratrix of the estate of R. H. Thomas, deceased, and she adopted the answer filed in the cause by R. H. Thomas.

Testimony was taken and exhibits were filed before Hon. T. Frank Hobson, Circuit Judge. After considering the testimony, the exhibits and the argument of counsel, the court entered its final decree, finding the equities of the cause to be with the owner and holders of outstanding unpaid and unexchanged bonds issued under and secured by the trust deed of May 1, 1923. The material parts of the final decree on this appeal are:

"4. That the trust deed hereinabove referred to as having been executed on the first day of May, A. D. 1923, by the Elks Club, a corporation, to the American Bank & Trust Company, as Trustee, constitutes a first and outstanding lien against the real estate described in said deed, and as hereinabove specifically set out, and all of the outstanding unpaid, unsatisfied and unexchanged bonds issued under said trust deed, dated May 1, 1923, together with interest thereon at the rate of 8 per cent per annum from the 1st day of November, A. D. 1929, are entitled to a priority of payment over any and all of the bonds issued by the said Elks Club, a Florida Corporation, subsequent to the first day of May, A. D. 1923.

"5. That the supplemental deed of trust executed by the Elks Club, a Corporation, with its principal office in the City of St. Petersburg, Pinellas County, Florida, on May 1, 1930, to the Central National Bank & Trust Company, as substitute trustee, constitutes a valid outstanding lien and encumbrance against the property described in said supplemental trust deed, which is the same property here-

inabove described, said lien created by said supplemental trust deed being subject, subordinate and inferior, however, to the lien of the trust deed executed by the Elks Club, aforesaid, to American Bank & Trust Company, as trustee, under date of May 1, 1923, and the bonds executed by the Elks Club, a Florida Corporation, as aforesaid, under and secured by said supplemental deed of trust, dated May 1, 1930, are subject, subordinate and inferior to the outstanding, unpaid and unexchanged bonds issued by the said The Elks Club, under date of May 1, 1923, and secured by the deed of trust as above described.

"6. That there is due L. M. McGouirk, as administrator of the Estate of Samuel E. Doane, deceased, by the Elks Club, a corporation, the sum of $5,000.00 principal, together with interest thereon at the rate of 8 per cent per annum from the 1st day of November, A. D. 1929, to this date, in the sum of $3,066.67.

"7. That there is due Ida Thomas Wilson, as administratrix of the Estate of R. H. Thomas, deceased, by the Elks Club, a corporation, the sum of $500.00 principal, together with interest thereon at the rate of 8 per cent per annum from the 1st day of November, A. D. 1929, to this date, in the sum of $306.67. * * *

"10. That when the sale of said property has been made by said Master in Chancery under the terms of this decree, that he disburse the proceeds of said sale as follows:

"(1) That he pay all the court costs which have accrued in connection with this litigation, including a Master's fee to himself, in accordance with the provisions of law in such cases made and provided.

"(2) That the total amount, principal and interest due L. M. McGouirk, as Administrator of the Estate of Samuel E. Doane, deceased, and the total amount, principal and interest, due Ida Thomas Wilson, as administratrix of the

Estate of R. H. Thomas, deceased, as hereinabove stated, be paid to Carey & Harrison, attorneys for L. M. Mc-Gouirk, as administrator of the Estate of Samuel E. Doane, deceased, as aforesaid, and to Bussey, Mann & Barton, attorneys for Ida Thomas Wilson, as administratrix of the Estate of R. H. Thomas, deceased, as aforesaid, respectively, for their respective clients.

"(3) That the remainder of the proceeds of said sale be paid into the registry of this court to be disbursed as this court may direct."

The sums found to be due were ordered to be paid within three days or the property would be sold at public sale to pay the same.

From this final decree, Harry W. Marden, as trustee, took this appeal.

Appellant presents two questions, and appellee, L. M. McGouirk, as administrator of the Estate of S. E. Doane, deceased, presents an additional question. But there is only one primary question involved, and that is whether those bondholders who accepted the refunding bonds in exchange for the original bonds thereby became subordinated in their security rights to the bondholders who did not exchange their bonds for refunding bonds.

It appears that no rights of third parties have intervened between the date of the issuance of the original bonds and the date of the issuance and exchange of the refunding bonds. The owner of the property, the Elks Club of St. Petersburg, Florida, did not even file an answer to the bill of complaint, and is not interested one way or the other in the outcome of this appeal. This controversy lies entirely between the holders of approximately $5,500.00 of the original bonds and the holders of approximately $114,-500.00 of the refunding bonds. as to whether the holders of the original bonds shall have priority in payment out of

the proceeds of the foreclosure sale, or whether they shall share in the proceeds pro rate with the holders of the refunding bonds.

A trust deed, as the term is employed in this case is, in effect, a mortgage on property, executed by the mortgagor to a third person, as trustee, to hold as security for the mortgage debt as evidenced by the bonds, for the benefit of the lenders, i.e., the purchasers of such bonds, instead of being executed directly to the bond purchasers, which would for obvious reasons be impracticable, if not indeed impossible. The written evidence of the mortgage debt, the bonds, which are secured by these trust deeds bear substantially the same relation to the trust deeds that promissory mortgage notes do to mortgages.

When the original bonds of May 1, 1923, were issued, all bondholders of the original series of bonds were on an equal footing so far as their rights to participate in the proceeds of any sale of the mortgaged property were concerned. The original trust deed, securing the obligation, contained this provision:

"To HAVE AND TO HOLD the above granted premises and appurtenances unto the said American Bank & Trust Company, as Trustee, as aforesaid, in trust, forever; to *equally* and *without preference* secure the payment to the lawful holder, when the same shall severally become due, three hundred and sixty first mortgage gold bonds, aggregating One Hundred and Thirty Thousand ($130,000.00) Dollars in the following demonmniations, that is to say:" (Emphasis supplied.)

Jones in his work on Bonds and Bond Securities says: "The date of the lien of a bond does not depend upon the date of its original negotiation. The entire series stands upon a footing of exact equality in this respect, the first one issued has no better or earlier lien than the last one. To

give priority of lien among a series of railway bonds secured by the same mortgage, according to priority of issue, would contravene the manifest design of the maker. It would be wholly impracticable. All the bonds secured are presumed to have been issued at the same time without reference to their numbers. Purchasers of bonds are not put to their inquiry whether the bonds were issued simultaneously with the mortgage by which they are secured. There is a presumption of law that all bonds secured by a mortgage were issued at the same time, and the fact that they are numbered consecutively gives no priority to those having the earliest numbers, and in no way interferes with the equality of all holders. Though the bonds are issued and sold at different dates, the whole issue is regarded as made as of the date of the trust deed, regardless of the time when the bonds were actually issued." 2 Jones—Bonds and Bond Securities (4th ed.) 108, Sec. 667.

In the same work on Bonds and Bond Securities, Jones states the rule in regard to each bond of the same series being entitled to its pro rate· share, as follows:

"In the distribution of the proceeds of a foreclosure sale under the mortgage securing a series of bonds, the holders of the bonds share pro rate in the distribution; and if the holder of a bond is entitled to its proceeds, the holders of other bonds cannot set up mere informalities in the manner of its acquisition. The question of ownership whether at law or in equity, is immaterial. The time and manner of the transfer of the bonds are not material; the only real question is' whether each holder is entitled to the bonds he claims. Each bond carries with it a fractional interest in the proceeds of the mortgaged property, determined by the proportion the amount of the bond bears to the whole amount secured. In the distribution, the pro rate of each bondholder is calculated upon the basis of the amount of

both principal and interest that is due him." 3 Jones—
Bonds and Bond Securities (4th ed.) 200, Sec. 1413.

Thus there was no priority among the bonds of the
original issue secured by the trust deed of May 1, 1923,
either as to payment of interest, payment of principal when
due or payment of proceeds from foreclosure sale, if one
had been made before the supplemental trust deed and re-
funding bonds had been issued.

This premise, the equality of all bondholders of the
original issue, having been clearly established, we will now
inquire how and when the original bondholders acquired,
if ever, this claimed right of priority over the remaining
bondholders who exchanged their bonds for refunding
bonds.

It is contended that because certain of the holders of the
original series of bonds exchanged their bonds for refunding
bonds secured by another deed of trust, that there was
thereby, in legal effect, an actual payment of the debt, ex-
tinguishing the first lien as to those bonds exchanged, and
that the refunding bonds issued under the second trust deed
took an inferior or secondary lien on the property.

The second trust deed, termed "supplemental Trust
Deed," after several recitals recognizing the existence of the
first trust deed, incorporated the following provisions seek-
ing to continue the lien of the first trust deed into the
supplemental trust deed:

"THIS INDENTURE THEREFORE WITNESSETH, that the
Mortgagor for divers good and valuable considerations, and
also in consideration of the aggregate sum named in the
bonds herein described, full and complete receipt whereof
is hereby acknowledged, does hereby in all respects *ratify
and affirm* that certain Trust Deed herein before mentioned,
dated the first day of May, A. D. 1923, and filed for record
and recorded on page 198 of Deed Book 79 in the office of

the clerk of the Circuit Court of the Sixth Judicial Circuit in and for the County of Pinellas and State of Florida, and encumbering the following described lands situate in the County of Pinellas and State of Florida, to-wit:" (description omitted), "together with all and singular the rights, easements, tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining; and all and singular any and all rents, issues, profits and income arising or to arise out of or from said above described property, including all fixtures, furnishings and furniture which may be placed in the building or buildings thereon, whether such buildings now exist or are hereafter erected; * * *

"That the Mortgagor, also for divers good and valuable consideration and also in consideration of the aggregate sum of One Hundred Twenty Thousand ($120,000.00) Dollars named in the Bonds hereinafter described, full and complete receipt whereof is hereby acknowledged, by these presents does *supplement* and *extend* the *aforesaid Trust Deed* unto the party of the second part at Trustee and unto its successor, or successors, in trust or its assigns forever, without however in any manner whatsoever abridging or limiting the rights of such Central National Bank & Trust Company as Trustee, its successor or successors, in Trust or its assigns, *or the rights of any individual holder of any bond heretofore issued and thereby secured thereunder* and in the following manner, that is to say:

"To HAVE AND TO HOLD the above granted premises, with the appurtenances unto the said Central National Bank & Trust Company, as Trustee, as aforesaid, and unto its successor, or successors in Trust, or its assigns, forever; *to equally and without preference to secure* the *payment* to the *lawful holder or holders thereof* as and when the same shall become due, three hundred thirty-six (336) First

Mortgage Class 'B' Gold Bonds aggregating the total principal sum of One Hundred Twenty Thousand ($120,000.00) Dollars in the following denominations, that is to say:

"Bonds numbered One (1) to Twenty (20) inclusive, in the principal sum of Fifty ($50.00) Dollars each.

"Bonds numbered Twenty-one (21) to One Hundred Eighty-five (185) inclusive, in the principal sum of One Hundred ($100.00) Dollars each.

"Bonds numbered One Hundred Eighty-six (186) to Two Hundred Eighty-two (282) inclusive, in the principal sum of Five Hundred ($500.00) Dollars each.

"Bonds numbered Two Hundred Eighty-three (283) to Three Hundred Thirty-six (336) inclusive, in the principal amount of One Thousand ($1,000.00) Dollars each.

"Signed, sealed and delivered by the Elks Club to the Trustee, all bearing date the First day of May, A. D. 1930, payable to bearer and numbered consecutively from One (1) to Three Hundred Thirty-six (336) both inclusive, bearing interest from the First day of May, A. D. 1930, at the rate of six (6) per cent per annum, payable semi-annually on the First day of November and the First day of May of each year until paid, as evidenced by the several interest coupons attached thereto, at the office of the Central National Bank & Trust Company, in the City of St. Petersburg, State of Florida, and maturing on the First day of May, A. D. 1940. Reserving, however, unto the maker thereof the right to redeem said bonds as hereinafter provided. The bonds with interest coupons attached and trustee's certificate thereon and each of them are in form, substance and tenor, save and except as to amounts and numbers, as follows, to-wit: * * *

"That the entire issue of Bonds hereinbefore and hereinafter referred to, being Bonds numbered One (1) to Three Hundred Thirty-six (336) both inclusive, and ag-

gregating the total principal sum of One Hundred Twenty Thousand ($120,000.00) Dollars have been concurrently with the execution and delivery of this supplemental Trust Deed delivered unto the Trustee fully signed and executed by the party of the first part and said party of the second part and *Trustee* is hereby *authorized* to and empowered to make deposition and *deliver* such, or any of *them, into* the *hands* of *third parties* only upon *receipt by present outstanding bonds* now secured by original Trust Deed, as aforesaid, in like principal *amount* into the hands of the Trustee for cancellation; or upon receipt of cash to the amount of the principal and accrued interest thereupon of the bond or bonds so disposed of and delivered. In the event of the *sale of any of the bonds* aforesaid *for cash* the said *Trustee shall immediately* with such cash proceed to *retire* and *cause to be canceled* a *bond* or *bonds* of the *present outstanding issue* hereinbefore referred to in *like principal amount* to the *bond* or *bonds so sold;* in the event that none of the original bonds shall be immediately available for payment and cancellation, the Trustee *shall hold such funds in trust for such purpose* until the same shall have been so used or until all of the bonds outstanding under the original issue shall have been duly surrendered and cancelled, whereupon the Trustee shall pay over and deliver any remaining portion of such funds so held unto the party of the first part." (Emphasis supplied.)

This Court has recognized the proposition that the refunding of an issue of bonds may be done so that it is an extension or continuation of the original obligation. In this regard, in the case of State v. City of Pensacola, 123 Fla. 331, 166 So. 851, we said:

"The very definite decision of this Court in the recent Marion County Refunding Bond Case (Folks v. Marion County, 121 Fla. 17, 163 So. 298) is authority for the propo-

sition that where refunding bonds are proposed to be merely issued and exchanged by the obligor for outstanding bonds, in order that the time of payment of the outstanding bonds may thereby be extended, that the obligation of the refunding bonds can lawfully be made a continuation of the legal obligation of the outstanding bonds refunded, since the refunding bonds in such an instance will be construed as mere renewals of the existing bonds on the same terms as to security, thereby carrying forward the identical obligation of the originals, unless otherwise provided by the refunding bond provisions, or by the statutes under which the refunding bonds are authorized." Citing cases.

The refunding bonds in this case as well as the original bonds were each secured by a deed of trust on the same property, each executed by the same mortgagor, the Elks Club of St. Petersburg, to secure the same debt. The evident purpose of the supplemental Deed of Trust, as evidenced by the language employed therein, was to preserve intact and to continue the lien on the property secured by the first Trust Deed, and was not to supersede or replace but was to supplement and extend the original trust deed so as to continue the security of the old bonds and also extend that security to the refunding bonds that were accepted in exchange for the old bonds by such owners and holders who would make such exchange, or that might be sold for moneys to be used in the retirement of old bonds. The effect of the supplemental deed of trust is to supplement the original trust deed and to continue the lien of the original trust deed as above outlined, unless the method employed for exchanging the refunding bonds precludes such effect.

Where refunding bonds are issued and are to be exchanged bond for bond, in like principal amount, with bonds of the original issue still outstanding, and the mortgage or trust deed so provides, there cannot be any question

but that the debt is the same, that the lien is continued, and that the refunding bonds are not payment of but merely a substitution of new bonds for old so that the due date of the principal may be extended, and in some cases, as in this, so that the interest rate may be reduced. State v. City of Pensacola, *supra*.

But where, in addition to the right to exchange refunding bonds for original bonds, the trust deed also grants authority to the trustee to sell the refunding bonds to the public and use the money from the sale to purchase and retire *pro tanto* the original bonds, the question arises; Does this authority vest the trustee with power to create a new debt, evidenced by a new contract, for the interim from the sale of the refunding bond until the payment of the money for the retirement and cancellation of the original bond, the result of which would create such a novation as would prevent the continuation of the original debt? This Court has answered this question in the negative, in so far as county or public bonds, secured by a pledge of the taxing power, are concerned. See Folks v. Marion County, 121 Fla. 17, 163 So. 298; 102 A. L. R. 659. We see no reason why the same principle announced in that case (the writer dissenting on that point) is not applicable here. It has been followed by this Court in many subsequent cases dealing with refunding operations of counties, cities, and taxing districts.

It might be noted that there is some division of authority on the question here presented. Jones in his Work on Bonds and Bond Securities (4th ed.) Volume 1, page 100, footnote 98, cites the cases holding for and against the proposition. He cites cases from the United States Supreme Court, Federal courts, the Iowa, North Dakota and Washington courts as holding that it is an increase in the indebtedness to allow refunding bonds to be sold and the proceeds to be used to retire original bonds; and he cites

cases from the Federal Courts, California, Kansas, Maine, Montana, New York, South Dakota and Wyoming courts as holding a contrary view. Then there is the much discussed decision by the United States Supreme Court in the case of Doon Township v. Cummins, 142 U. S. 366, 35 L. ed. 1044, 12 Sup. Ct. 220, decided in January, 1892, in which case Justices BROWN, HARLAN and BREWER dissented. This decision, however, was explained and limited in its effect by a decision of the District Court of the Southern District of New York, filed July 8, 1935, in the case of Kelly v. Central Hanover Bank & Trust Co., 11 Fed. Supp. 497, Judge Mack, Circuit Judge, writing the opinion. In that case it was said:

"In Doon Township v. Cummins, 142 U. S. 366, 12 Sup. Ct. 220, 35 L. ed. 1044 (1892), on which plaintiff and cross plaintiff rely, the court was confronted by an unusual situation. The Iowa Constitution (Const. 1857, Art. II, Sec. 3) provided that no political or municipal corporation 'shall be allowed to become indebted, *in any manner, or for any purpose* beyond a certain amount. (Italics mine.) The majority of the court, stressing the italicized words, held that the prohibition embraced all increases of indebtedness, whether temporary or otherwise, and regardless of the result sought to be accomplished thereby. Of the $25,000.00 received from the sale of the refunding bonds, less than $6,000.00 was applied to the retirement of the existing bonded indebtedness; the remainder being used for various unauthorized purposes. Under the constitutional limitation, the maximum permissable debt was less than $6,600. The case illustrates the danger to the credit of municipal corporations, due to the dishonesty or inefficiency of their officers, which might result from a more liberal interpretation of the constitutional provision. It is to be noted, too, that the court was applying what it deemed to be Iowa Law,

and was not adopting any general rule of interpretation either of constitutions or of contracts. Furthermore, in that case, the sole question was whether or not the bonds were a nullity; here, the indebtedness, evidenced by notes, is concededly valid as between I. U. I. and the lenders. The Doon Township case has not been cited or referred to by the Supreme Court since it was decided; it has frequently been criticized and but rarely followed. See *e. g.,* City of Huron v. Second Ward Savings Bank, *supra;* City of Pierre v. Dunscomb, 106 F. 611 (C. C. A. 8th, 1901)."

The opinion in that case went on to show the difference in result between a governmental entity exceeding its debt limitation and a private corporation exceeding its debt limitation, by the following:

"In the present case, we are concerned with a contractual, not a constitutional, prohibition. Debts incurred in violation of the covenant are none the less binding obligations of the company, even though by their creation it has broken its contracts with the debenture holders, whereas debts incurred in violation of the constitutional limitation are void."

Even though the Supreme Court of the United States has held as it has on the proposition, other States have held to a contrary view regarding the obligations of government entities. In Opinion of the Justices, 81 Maine 602, 18 Atl. 29, the Supreme Court of Maine said:

"If the new bonds be exchanged for the old, bond for bond, it would literally be a renewal and extension of the debt; and if the new bonds are sold to obtain means with which to liquidate the old, it will, in all essential respects, amount to the same thing. The same result will be reached, as far as the State is concerned. The old bonds were evidence of the war debt. The new bonds will become such evidence by substitution. The holders of the old bonds would, in equity be considered as receiving payment of their

debt from the purchasers of the new bonds, when the money received from the new is applied to take up the old bonds, and the act provides that the receipts of sale shall be so applied, and the judicial remedy may be had, if need be, to prevent misapplication. Whether the debt of the State be represented by the one set of bonds or the other, it is one and the same debt as far as the Constitutional provision affects the question. The new issue postpones payment of the debt, but does not extinguish it."

This case was decided before the Supreme Court of the United States rendered its decision in Doon Township v. Cummins, *supra.* But in the case of City of Poughkeepsie v. Quintard, 136 N. Y. 275, 32 N. E. 764, decided about eleven months after the case of Doon Township v. Cummins, *supra,* the Court of Appeals of New York said:

"The two forms of extension authorized are: *First* an exchange of old for new bonds securing the new credit at the lower rate of interest; and, *second,* to meet the emergency of a refusal by holders to make the exchange bond for bond, the issue and sale of new bonds, applying the proceeds to the cancellation of the old ones. The City of Poughkeepsie chose the latter course, but is met by a refusal of the purchaser to take the new bonds upon the ground that it is a borrowing of money prohibited by the charter. It must be conceded that the transaction in form may be a borrowing of money, but in substance, it is the very different case of refunding an existing debt. There is a new creditor, and a reduced rate of interest, but the same old debt. The municipal liability is not increased, but merely suffered to remain; and not a dollar of new or added debt results. The transaction is no different from what it would have been if there had been an exchange of bonds."

Another strong case along the same line is the case of National Life Insurance Co. v. Mead, 13 S. D. 37, 82 N. W.

78, 48 L. R. A. 785, 79 A. S. R. 876, decided over eight years after the case of Doon Township v. Cummins, *supra.*

Here, all the bondholders were originally on a parity, each entitled to his pro rate fractional interest in the security afforded by the mortgage. After $10,000.00 of the original debt had been paid, this issue of refunding bonds and supplemental mortgage for the remainder of the debt were authorized. The effect of this refunding operation did not diminish in the slightest the proportionate interest in the mortgage security of those who chose to retain their old 8 per cent bonds. Indeed, the contractual rights of the holders of the original issue were not in any way prejudiced or impaired. Both issues were authorized for the same debt or obligation, which debt was not increased.

It has been held that a mortgage does not lose its priority by the taking of a renewal mortgage for the same debt and the property is not released from the lien. Likewise, that the giving of a new note secured by a deed of trust for the same debt, does not deprive the holder of the new security of the right to foreclose the original mortgage. Jones on Mortgages, Vol. 2, Sec. 1187, p. 664. And it has also been held that no change in the form of the evidence of the debt, or in the mere mode or time of payment, will discharge a mortgage, which instrument secures *the debt,* and not merely the written note or bond, or other evidence of the debt. Also, that the giving of a different instrument as evidence of the debt does not *per se* affect the security for the debt afforded by the mortgage and will not, as between the parties, deprive the creditor of the security afforded by the mortgage so long as the original debt remains unpaid. 2 Jones on Mortgages, Sec. 1182, pp. 656-658; Drake Lumber Co. v. Semple, 100 Fla. 1767, 130 So. 577, 75 A. L. R. 687. Whether the taking of a second mortgage amounts to an extinguishment of the first may depend upon the intention

of the parties. Federal Land Bank v. Goodwin, 107 Fla. 537, 136 So. 513, 145 So. 883.

There may be some question as to whether the method of selling refunding bonds and using the proceeds to buy original bonds is an increase in the indebtedness, when a political subdivision or taxing unit is involved, but where, as here, the one executing the trust deed on the property as security for the debt is a corporation, and there is no intervention of the rights of third parties, but the controversy is between the bondholders, and there is no violation of any constitutional or contractual provision relating to exceeding debt limitation, and the provision of the trust deed, as here, requires that if any refunding bonds are sold for cash the trustee "shall immediately with such cash proceed to retire and cause to be cancelled a bond or bonds of the present outstanding issue hereinbefore referred to in like principal amount to the bond or bonds so sold," and further provides that if none of the original bonds are immediately available for payment the Trustee "shall hold such funds in trust for such purpose until the same shall have been so used or until all of the bonds outstanding under the original issue shall have been duly surrendered and cancelled, whereupon the trustees shall pay over and deliver any remaining portion of such funds" to the party of the first part, The Elks Club of St. Petersburg; and the amount of the refunding bonds to be issued under the supplemental trust deed is the same as the amount of bonds outstanding under the original trust deed ($120,000.) ; then there is no question but that the money procured from the sale of the refunding bonds, if any, must, under the provisions of the supplemental trust deed, be used to retire the original bonds issued under the original trust deed, and can not be used to create any new or additional obligation; and such has been the course pursued in this case, thereby preserving

intact the lien sought to be preserved for the equal and undiminished protection of the holders of the old as well as the holders of the new or refunding bonds. Therefore those few persons who saw fit to hold on to their old 8 per cent bonds, while entitled to their 8 per cent interest, are not entitled to any priority of payment out of the proceeds of the foreclosure sale.

We conclude therefore that the Circuit Judge erred in holding, in effect, that the holders of the original bonds were entitled to priority in payment out of the proceeds of the sale over the holders of refunding bonds. The final decree is accordingly reversed and the cause is remanded for appropriate proceedings not inconsistent with the views herein expressed.

It is so ordered.

WHITFIELD, P. J., and CHAPMAN, J., concur.

TERRELL, C. J., concurs in opinion and judgment.

Justices BUFORD and THOMAS not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 2-A of the Rules of this Court.