566 So.2d 1296 (1990)
THUNDERBIRD, LTD., a Florida Limited Partnership; Thunderbird Management, Inc., a Florida Corporation; Financial Investment Corporation, a Florida Corporation; J. Steven Wilson; Courtenay Sands Wilson; Philip A. Browning, Jr.; Patricia Browning; and Boston Sports Associates, a General Partnership under the Partnership Act of the Commonwealth of Massachusetts, Appellants/Cross-Appellees,
v.
GREAT AMERICAN INSURANCE COMPANY, Appellee/Cross-Appellant.
Nos. 88-01934, 88-01935.
District Court of Appeal of Florida, First District.
June 18, 1990.
As Clarified on Rehearing September 27, 1990.
*1297 John L. Taylor, Jr., Otto F. Feil, III, and Michael A. Cole of Vincent, Chorey, Taylor & Feil, Atlanta, Ga., for appellants/cross-appellees, Philip A. Browning, Patricia Browning, Financial Inv. Corp., and Thunderbird Management, Inc.
C. Harris Dittmar and Timothy J. Corrigan of Bedell, Dittmar, DeVault & Pillans, Jacksonville, for appellants/cross-appellees J. Steven Wilson and Courtenay Sands Wilson.
Gerry S. Gibson of Steel, Hector & Davis, Miami, and Frederick R. Brock of Gartner, Brock & Simon, Jacksonville, for appellee/cross-appellant.
WIGGINTON, Judge.
These consolidated appeals and the cross-appeal arise from a lawsuit filed by Great American Insurance Company to foreclose on its mortgages following default by the mortgagee, Thunderbird, Ltd. We affirm in part and reverse in part.
The circumstances leading to the instant lawsuit began on February 27, 1978, when Thunderbird, Ltd. executed two promissory notes in favor of Great American's predecessor and assignor, the Provident Bank, in the respective amounts of $2,725,000 and $800,000. Both notes were secured by the real and personal property and other assets making up the Thunderbird Resort Motel in Jacksonville. Additionally, the $800,000 note was also guaranteed by appellants Wilsons and Brownings, but only to the extent of $800,000. Thereafter, on December 18, 1978, Thunderbird, Ltd. executed a third promissory note in the amount of $1,375,000, secured by an additional mortgage on the same motel. This third note was also guaranteed by the Brownings and the Wilsons but without the cap specifically provided for in the $800,000 guaranty.
Following a default by Thunderbird, Ltd. on the three notes in July 1982, Great American filed the instant lawsuit to foreclose its mortgages and security agreements, and to seek other relief. Counts V and VI of the complaint advanced claims against the Wilsons and the Brownings, as guarantors, for repayment of the notes based upon the default of Thunderbird. For approximately 18 months beginning in October 1982, the foreclosure action was stayed pending resolution of Thunderbird's filing for reorganization under Chapter 11 of the United States Bankruptcy Code. When the Chapter 11 proceeding was ultimately dismissed in March 1984, the instant proceeding resumed. In November, the trial court appointed a receiver for the motel, who operated the motel until foreclosure. Ultimately, the trial court entered a final summary judgment foreclosing on the property and directing sale of the motel to satisfy the indebtedness on the note, including interest, reimbursement for real estate taxes, attorney's fees and costs for a total debt of $6,820,948.56.
Thereafter, on January 30, 1985, Great American appeared at the foreclosure sale and bid in $3,600,000 of its debt for the property as reflected on the certificate of sale. Pursuant to the certificate of sale, a certificate of title was issued to Great American for the motel and certain other collateral. Great American then voluntarily dismissed its claim for deficiency against Thunderbird and proceeded solely on Counts V and VI of the complaint against the Wilsons and the Brownings as guarantors.
At the non-jury trial held to determine the guarantor's liability, Great American in its case-in-chief introduced only the certificate of sale as evidence of the value of the property it had received at the foreclosure sale. Following the close of Great American's *1298 case, appellants moved for an "involuntary dismissal." The court denied the motion.
In their case, appellants presented expert testimony that the fair market value of the subject property on the date of foreclosure exceeded $7,000,000. Great American unsuccessfully moved to exclude the appraisers' opinions. However, over appellants' objections, the trial court permitted Great American in rebuttal to introduce expert testimony that the fair market value of the property was $3,600,000. Nevertheless, at the conclusion of the trial, the court found as a matter of fact that the "value of the Thunderbird Resort Hotel on January 30, 1985 [the date of foreclosure sale] was $5,600,000."
A post-trial hearing was conducted to determine how the $5,600,000 should be applied against the debt due on the three notes. The trial court adopted Great American's position that said amount should be applied first to the $2,725,000 non-guaranteed note, holding that the "main principle of equity applicable to this case is that a creditor should be made whole" and that appellants "have no legal right to insist on an allocation of the foreclosure sale proceeds to reduce the extent of their obligation under the guaranties."
Additionally, in its original final judgment, the court held that the guarantors were not liable for Great American's payment of the $400,000 in ad valorem taxes on the property. However, on rehearing, the court reversed itself holding that the guarantors "are responsible for the delinquent real estate taxes." The court denied appellants' motion for rehearing concerning the pro rata allocation of same.
Great American also sought attorney's fees of $183,000 and the court, after conducting an evidentiary hearing, awarded $160,551.20 in fees. In arriving at that sum, the trial court reduced the requested fee first by $13,000 found to be travel expenses by Great American's Miami counsel, and a further 10%, or $9500, for unspecified matters conducted by that firm "unrelated to the guaranties."
Finally, the court awarded Great American over $206,000 in costs, concluding that because the guaranties provided the guarantors would reimburse Great American "for all expenses incurred" in enforcing the guaranties, the court need not look at the reasonableness of Great American's costs. This cost award included over $33,000 for Great American's expert appraiser, and over $159,000 in expenses which Great American allegedly had incurred in the foreclosure action. Consistent with these rulings, the court entered an "Order on Motions for Rehearing, Motion for Award of Attorney's Fees and Expenses, and Amended Final Judgment on Counts V and VI of the Complaint" which adjudged that the guarantors were jointly and severally liable in the total amount of $1,668,156.49, plus attorneys' fees of $160,551.20, additional expert witness fees of $2,025.00, and costs in the amount of $206,597.83, for a total judgment of $2,037,330.52. Five points are now raised by appellants on appeal and two points are raised by appellee on cross-appeal. These points shall be addressed below seriatim.

I
Under Point I, appellants argue that the trial court erred in failing to grant the guarantors' motion for involuntary dismissal on the basis that Great American did not prove the value of the assets was insufficient to satisfy the debt. In so arguing, they rely on the general rule that as plaintiff in an action at law on the guaranties, Great American had the burden of proving that the value of the assets it received through foreclosure was less than the total indebtedness which appellants partially guaranteed. Norwest Bank Owatonna, N.A. v. Millard, 522 So.2d 546 (Fla. 4th DCA 1988); CSI Services, Ltd. v. Hawkins Concrete Construction Co., 516 So.2d 337 (Fla. 1st DCA 1987).
While the foregoing is a correct statement of the law, we disagree with appellants that Great American's action in placing before the trial court the certificate of sale would entitle appellants to judgment as a matter of law. Certainly, as was *1299 shown in R.K. Cooper Construction Co. v. Fulton, 216 So.2d 11 (Fla. 1968), such evidence would have been insufficient upon which the trial court could have entered summary judgment in favor of Great American, but it was nonetheless sufficient evidence below to shift the burden to appellants of going forward with other evidence concerning fair market value of the property. Fara Manufacturing Co., Inc. v. First Federal Savings and Loan Association of Miami, 366 So.2d 164 (Fla. 3d DCA 1979). A legal presumption exists that the foreclosure sale price equals the fair market value of the property. Withers v. Flagship Peoples Bank of Tallahassee, 473 So.2d 789, 791 n. 1 (Fla. 1st DCA 1985). Thus, once Great American presented evidence of its $3.6 million foreclosure sale bid, appellants had the burden of presenting contrary evidence on the issue of value. Significant, however, is the fact that the trial court did not find that fair market value was as reflected in the certificate of sale, but instead found fair market value to lie somewhere in between that amount presented by Great American and the figures presented by appellants' experts. Accordingly, for the foregoing reasons, we affirm.

II
As their Point II on appeal, the Wilsons assert that in assessing the guarantors' liability, the trial court erred in failing to pro rate the value of the foreclosed property received by Great American among the three promissory notes. In a separately filed appellate brief, the Brownings advance an alternative argument to pro rata allocation  in which argument the Wilsons concur  maintaining that both guaranty contracts contain express language resolving this issue in favor of the guarantors. In support thereof, the Brownings point to language in paragraph (4) of the contracts which allowed Great American to elect at its option whether or not to foreclose on the collateral. In the event, however, of Great American's election to foreclose, the guaranty contracts expressly state that the "net proceeds therefrom, ... shall be applied in reduction of the amount due on the Note." According to the Brownings, by the use of this language, the guarantors and Great American's predecessor, Provident, agreed that any funds obtained through foreclosure of the underlying collateral would be applied first to reduce the debt on the guaranteed notes.
Significant to the Brownings' argument is the portion of the guaranty contracts expressly defining the guaranteed notes as well as the other note for $2,725,000 which was not guaranteed. For instance, the February 27, 1978 guaranty contract references the $2,725,000 note but specifically designates the $800,000 guaranteed note as the "Note." Thereafter, paragraph (4) provides that if foreclosure is availed of, "only the net proceeds therefrom, after deduction of all charges and expenses of every kind and nature whatsoever, shall be applied in reduction of the amount due on the Note, Agreement and Security Documents." (emphasis supplied). Similarly, the December 18, 1978 guaranty contract refers to the $1,375,000 guaranteed note as the "Additional Note" and provides in paragraph (4) that if foreclosure is availed of "only the net proceeds therefrom, after deduction of all charges and expenses of every kind and nature whatsoever, shall be applied in reduction of the amount due on the Additional Note, Additional Loan Agreement and Additional Security Documents." (emphasis supplied).[1]
*1300 The Brownings argue that because of this precision in separately defining the guaranteed notes and non-guaranteed note, it is clear the contracts could have been written to require that the foreclosure proceeds be applied first to the non-guaranteed note. Instead, Provident, Great American's predecessor, chose not to include any such provision in the guaranties but deliberately drafted the guaranty contracts to provide that the foreclosure proceeds "shall" be applied to the guaranteed notes. In entering its order, the Brownings and Wilsons assert that the trial court totally ignored this express contract language.
In response, Great American points to further language in paragraph (4) which, it argues, granted Great American the option of applying the amount so credited to it from foreclosure against the balance of indebtedness due on the guaranteed notes. This particular language appears at the end of paragraph (4) in the February guaranty contract as follows:
At any sale of the security or collateral for the indebtedness or any part thereof whether by foreclosure or otherwise, [Great American] may at its discretion purchase all or any part of such collateral so sold or offered for sale for its own account and may apply against the balance due under the Note, Agreement and Security Documents, the amount paid or credited to [Great American] from any such sale. [The December 18, 1978 guaranty contains similar language except that it refers to the "Additional Note... ."] (emphasis supplied).
In contrast, Great American submits that the provision of the guaranty contracts relied on by the Brownings "merely defines the amount of any proceeds from a foreclosure sale which would be applied against any of the indebtedness."
In the seminal case of Consolidated Naval Stores Co. v. Wilson, 82 Fla. 396, 90 So. 461 (1921), the supreme court held that there are two independent grounds on which the foreclosure proceeds must be applied first to the guaranteed portion of the debt: (1) when there is such an agreement between the parties; or (2) when the guarantor has agreed to be the security for only a limited part of the debt, and the purpose of that indorsement is not to afford additional security to the mortgage. The Brownings submit that both grounds are present in the instant case. We agree with Great American that neither ground is applicable. First, contrary to appellants' position, there is no express agreement between the parties in the guaranty contracts directing that, under the circumstances in this case, the fair market value of the property be applied first against the guaranteed portion of the debt. Although they point to the language in paragraph (4) regarding *1301 application of net proceeds following a foreclosure sale, that phrase merely defines the amount of proceeds which shall be applied in reduction of the "Note." This intent is evidenced by the fact that "net proceeds" is modified by the preceding word "only," thereby emphasizing which proceeds arising from a foreclosure sale are to be applied to the reduction of the "Note." On the other hand, paragraph (4) goes on to specifically address the circumstances of the instant case where Great American, at the sale of the security, purchased all of the collateral for its own account. Thus, by the express terms of that latter provision, Great American "may apply," at its option, the amount credited to it from such sale against the balance due under the guaranteed notes. Had the parties intended that it be mandatory to apply the proceeds to the guaranteed notes, they certainly could have used the term "shall," as used in the preceeding provision.[2]
As to the second ground advanced by the Brownings, again, there is nothing in the documents suggesting that the guarantors could be considered as accommodation indorsers on the note which, according to the holding in Consolidated Naval Stores, would have accorded them an equity to be considered in the application of the foreclosure proceeds. Instead, all indications in the record lead to the conclusion that the guaranties were given as additional security to Great American's predecessor to extend the loan.
In contrast, the Wilsons distinguish the instant case from Consolidated Naval Stores on the basis that here the funds applied to diminish the debt were obtained involuntarily through judicial proceedings. Thus, they argue in the alternative that under such circumstances, the "proceeds" from the foreclosure sale should be applied on a pro rata basis. First, the Wilsons point to Florida law recognizing that when there are multiple notes with the same maturity date and secured by the same collateral, the proceeds of the foreclosure should be allocated to reduce the indebtedness owed on each note on a pro rata basis. See Marden v. Elks Club, 138 Fla. 707, 190 So. 40, 43 (1939); 37 Fla.Jur.2d Mortgages and Deeds of Trust, §§ 135 and 414 (1982). Then, by extension, they suggest that Florida would follow the majority of other jurisdictions in supporting the application of the pro rata rule to guaranty contracts when the guarantors have only guaranteed a portion of the total debt and where, as here, the proceeds of the sale of collateral have been obtained through judicial proceedings or other involuntary means. See 57 A.L.R.2d 849, 881 (1956); 38 C.J.S. Guaranties section 78 (1943); Bank of Streeter v. Nester, 385 N.W.2d 95 (N.D. 1986).
Of course, the annotation appearing at 57 A.L.R.2d observes initially that in these cases "the court will make the application in such a manner, in view of all the circumstances of the particular case, as will best protect the interest of all the parties ... [and] in the absence of countervailing equities, the proceeds of collateral ... will be applied pro rata among the debts for which the collateral was security... ." (emphasis supplied). As Great American notes, the primary case relied on in that annotation to support pro rata application involved an instance where the mortgage expressly named the guarantors as beneficiaries. See Hargis Bank & Trust Co. v. Gambill, 234 Ky. 538, 28 S.W.2d 769 (1930). In contrast, Great American also points to paragraph (3) of the instant contracts wherein the guarantors agreed
... that they shall have no right of subrogation whatsoever with respect to the aforesaid indebtedness, or to any monies due and unpaid thereon or any collateral securing the same, unless and until [Great American] shall have received payment in full of all sums at any time secured by the Additional Security Documents.
*1302 We are aware of the Florida rule as to the application of payments generally, to the effect that:
... if neither the debtor nor the creditor at the time of payment makes any application thereof, the law will appropriate it to the items of indebtedness according to the justice of the case, having in view the interests of third persons interested.
White Construction Company, Inc. v. DuPont, 478 So.2d 485, 487 (Fla. 1st DCA 1985). Thus, to whatever extent the trial court was of the view, as reflected in the final judgment, that proceeds from a forced sale may in all cases be applied free from any equity in favor of the guarantors, it misconstrued the law. Nonetheless, in that we have concluded that paragraph (4) embodies the agreement between the parties insofar as it did not preclude the result reached herein, we hold the court did not abuse its discretion in applying the proceeds of the foreclosure sale first to the non-guaranteed portion of the debt. Thus, we affirm the final judgment to that extent.

III
Next, under Point III, appellants argue that in assessing the guarantors' liability, the trial court erred in including certain property taxes paid by Great American. We agree and must reverse.
In its original final judgment, the trial court held that the guarantors were not liable for Great American's payment of over $400,000 in ad valorem taxes on the Thunderbird property. On rehearing, however, the trial court reversed itself holding that the guarantors were responsible for the delinquent real estate taxes. The taxes in question, included in Great American's claim for relief in the foreclosure action, where the amounts it had paid to satisfy the delinquent 1980, 1981 and 1982 real estate taxes paid in 1984.[3] Appellants correctly point out, though, that the property taxes were paid by Great American after the March 1, 1983 maturity date of the notes. The guaranties by their terms guaranteed only the payment of the principal of the note, the interest thereon, and any other monies due or which may become due thereon. The notes provided for a five-year term and that Great American "shall have the right, on the last day of each month during the term of this Note to add to the principal... any other charge provided for in the Loan Agreement and the Security Documents" (emphasis supplied). Additionally, paragraph 1.5 of the mortgages gave the mortgagee the option to pay any taxes assessed against the mortgaged property which would thereby create an indebtedness owing from the mortgagor that was immediately due and payable with interest by the mortgagor to the mortgagee, Great American. However, it did not create an indebtedness which could be added to the principal sum due under the guaranteed note because the payment by Great American was not made during the term of the note. Consequently, we agree that the trial court did err by including the property taxes in assessing the guarantors' liability.

IV
Appellants' Point IV challenges the trial court's award of attorney's fees and costs to Great American.[4] Although we disagree with appellants' position that the trial court was required to reduce the fees requested by Great American to account for the fact that it hired two separate law firms to represent it in the action on the guaranties, we agree that the court erred in awarding fees encompassing work performed that was not attributable solely to the guaranties, as required by paragraph (7) of the guaranty contract. A similar problem exists as to the costs awarded.
*1303 In regard to the attorneys' fees, appellants refer to the rather inadequate documentation of the $88,000 fee requested by the firm of Gartner & Phillips. Mr. Brock of that firm testified that before January 1, 1985 (the approximate date of the entry of the foreclosure judgment and foreclosure sale), approximately 50% of his time was spent on guaranty-related matters. Unlike the fee application submitted by Great American's other trial counsel, Steel, Hector & Davis, Mr. Brock made no attempt to segregate guaranty-related time on his billing sheets. Appellants point to the significance of this fact since Mr. Brock had also represented Great American in the foreclosure action, for which he received an attorney's fee in the summary final judgment of foreclosure. Mr. Brock admitted that the 50% figure was simply an estimate based on his review of the billings and he could not point to specific billed items to justify the figure. Moreover, he in fact testified that much of the time reported prior to January 1, 1985, concerned the foreclosure, receivership and bankruptcy proceedings, for which the court had previously awarded fees in the summary final judgment of foreclosure.
Appellants also point to problems concerning the fees requested by Gartner & Phillips for work performed after the entry of the summary final judgment of foreclosure. Although Mr. Brock testified that 100% of his time spent after January 1, 1985, was attributable to the guaranties, his billing records indicate otherwise. For instance, his January 1985 statement shows that much of his time involved the sale of the Thunderbird property at foreclosure. Additionally, his May and August 1985 statements also show significant time devoted to non-guaranty matters. Moreover, Brock testified that because of the way his computer system was programmed, many of his time records do not show the actual amount of time billed for each task.
Under the holding in Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985), it is the movant's responsibility to provide adequate documentation of the hours spent by his attorneys. That requirement is further limited in the instant case to fees arising strictly from the enforcement of the guaranties' provisions. Here, Gartner & Phillips' documentation is little more than an estimation of the time expended on the guaranty action and obviously includes time spent on the foreclosure and receivership actions as well. Accordingly, on remand, it will be incumbent on Great American to produce more detailed documentation of time spent strictly on the enforcement of the guaranties.
With respect to the award of over $206,000 in costs, a similar problem exists. The Brownings point to approximately $156,271.66 of costs included in the expenses award again related solely to the foreclosure and sale of the property pursuant to the bankruptcy proceedings. Also, appellants argue against the $33,000 awarded for an expert appraiser hired by Great American. We agree that the trial court erred in failing to assess the reasonableness of that latter cost without holding an evidentiary hearing, since a specific objection was made below by counsel for appellants to the setting of such a fee. Cf. Lafferty v. Lafferty, 413 So.2d 170 (Fla. 2d DCA 1982). Consequently, the award of costs is also reversed and remanded for further proceedings for the court to consider only those amounts expended to enforce the guaranty contracts and to take into account and determine the reasonableness of the claimed expert witness fees.

V
As its last point, the Brownings urge that the trial judge erred in failing to grant Philip Browning, Jr.'s verified motion for disqualification. The motion recited the judge's continued ex parte contact with the receiver and expressed a concern that the contact and interaction between the judge and the receiver might render the judge incapable of making an objective and unbiased evaluation of the value of the property. We affirm. The motion was legally *1304 insufficient as the assertion "does not set forth a well-grounded fear and ... fails to show the personal bias or prejudice on the part of the trial judge necessary for disqualification." Walton v. State, 481 So.2d 1197 (Fla. 1985). As was earlier established in Hayslip v. Douglas, 400 So.2d 553, 556 (Fla. 4th DCA 1981),
[t]he term "legal sufficiency" encompasses more than mere technical compliance with the rule and the statute; the court must also determine if the facts alleged (which must be taken as true) would prompt a reasonably prudent person to fear that he would not get a fair and impartial trial.
In the instant case, the trial court correctly adjudged that the facts alleged were insufficient.
In summary, we have affirmed the trial court's denial of appellants' motion for involuntary dismissal on the issue of the fair market value of the property. We have also affirmed the trial court's denial of Philip A. Browning, Jr.'s motion for disqualification and its method of applying the value of the foreclosed property first against the debt due on the unguaranteed note. Nevertheless we reverse the final judgment insofar as it includes property taxes paid by Great American outside the term of the notes, as well as including in the award of attorneys' fees and costs to Great American amounts not incurred in connection with enforcement of the guaranty provisions. Consequently, on those points we must remand the cause for further proceedings consistent with this opinion. Next, we turn to Great American's cross-appeal.

I
As its first point on cross-appeal, Great American argues that the trial court erred in reducing the number of hours upon which the award of attorneys' fees to it was calculated. Specifically, the trial court deducted $13,000 from the hourly fee award to Great American's attorneys for travel related expenses attributable to the firm of Steel, Hector & Davis, and an additional 10%, or $9500, from the fees of that firm for matters unrelated to the guaranties. As both of these deductions apparently were arbitrarily made, and no basis for the deductions was cited by the court in its order, we must reverse.
In regard to the $13,000 reduction for travel time, the record contains testimony showing that two attorneys traveled from Miami to Jacksonville, one of whom spent approximately 30 hours in travel and the other approximately 20 hours. Evidently, instead of considering only those approximately 60 hours of travel time, the trial court attributed 60 hours to each attorney, which would approximate the time deducted. Further, there is no evidence showing that 10% of that firm's time was spent on matters unrelated to the guaranties. However, as indicated above, there was evidence in the record suggesting that time was spent on matters unrelated to the guaranties for which the appellants should not be charged. Thus on remand, the trial court will have an opportunity to revisit this issue.

II
As its second point on cross-appeal, Great American submits that the trial court's reliance on the fair market value opinions of appellants' appraisers constituted an abuse of discretion. We affirm. As set forth by the Brownings in their brief, the testimony of these experts was sufficiently admissible evidence subject to the court's consideration. We disagree with Great American's position that expert witness Broom's testimony was premised on inadmissible hearsay and find that the opinions in Bunyak v. Clyde J. Yancey and Sons Dairy, Inc., 438 So.2d 891 (Fla. 2d DCA 1983), and Smithson v. V.M.S. Realty, Inc., 536 So.2d 260 (Fla. 3d DCA 1988) are inapposite. In Bunyak an hydrologist rendered his opinion based solely on a reiteration of a geologist's opinion, and in Smithson the expert testified solely to *1305 hearsay statements made to him without any refinement on his part, thereby essentially serving as a conduit for the inadmissible hearsay. Here, the record shows that Broom supported his opinions with accurate and adequate testimony based on facts and data reasonably relied upon and utilized by experts on the subject of hotel appraisals. More appropriate to this case is the rule that it is within the trier of fact's discretion to arrive at a conclusion of valuation somewhere between the low and high figure given by the expert appraisers. County of Sarasota v. Burdette, 479 So.2d 763 (Fla. 2d DCA 1985), rev. denied sub nom., IRE Real Estate Fund, Ltd. v. Sarasota County, 488 So.2d 830 (Fla. 1986); Behm v. Division of Administration, State Department of Transportation, 292 So.2d 437 (Fla. 4th DCA 1974), approved, 336 So.2d 579 (Fla. 1976).
Although Great American argues that expert witness Price's testimony should have been excluded because his evaluation was not rendered as of the date of foreclosure, Price's testimony shows otherwise. Also, he did give consideration to any market changes and in fact concluded that there had been none since an earlier evaluation in May 1984. Department of Transportation v. Samter, 393 So.2d 1142 (Fla. 3d DCA 1981), relied on by Great American for the proposition that it was error for the court to base a fair market value determination upon a completely unverifiable subjective opinion  i.e., that Price's opinion was based on hypothetical projections, none of which represented the actual performance of the property  is misplaced. There was nothing contained in Price's testimony indicating that the properties he compared were dissimilar or that his figures were artificial. Also, since the trial court arrived at a valuation less than that rendered by Price, it is obvious that it accorded less weight to some of Price's calculations and projections.
Based on the foregoing, the appeal and cross-appeal in this case are AFFIRMED in part and REVERSED in part, and the cause is REMANDED for further proceedings consistent with this opinion.
SHIVERS, C.J., and BARFIELD, J., concur.

ON REHEARING
WIGGINTON, Judge.
Motions for rehearing have been filed by appellants and appellee. We deny the motions but clarify our opinion in the following manner.
Under section II of the opinion, we construed the last sentence of paragraph (4) of the guaranty contract to mean that Great American, at its option, could have applied the amount credited to it upon its purchase of the collateral against the balance due under the guaranteed notes. However, upon further consideration we agree with appellants Brownings that the clause does not grant such an option but rather simply allowed Great American to purchase the collateral at the foreclosure sale and, instead of paying cash, to conveniently apply its bid against the indebtedness.
Nevertheless, we disagree with the Brownings to the extent they argue that the provision by its terms required Great American to apply its bid price against the guaranteed indebtedness. To the contrary, the clear language of the clause allowed Great American to apply the value of the collateral purchased "against the balance due under the Note, Agreement and Security Documents...." (emphasis added) Thus, the clause not only contemplates application against the balance due under the guaranteed note, but also against the balance due under the agreement and under the security documents. In regards to the February 27 transaction, the agreement and security documents clearly contemplate the entire debt of $3,525,000, including the unguaranteed note of $2,725,000. Had the parties intended that Great American apply the value of the collateral purchased against the guaranteed notes only, there would have been no point in including the remaining language referring to the agreement and security documents. Again, as noted earlier in the original opinion, *1306 although the general rule is that "an agreement of guaranty is construed against the party who prepared or presented same," Miami National Bank v. Fink, 174 So.2d 38 (Fla. 3d DCA 1965), we simply do not perceive there to be an ambiguity in the disputed paragraph.[1]
Turning to the Brownings' and Wilsons' additional argument on rehearing on the issue of Great American's failure to introduce evidence as to the value of the non-real estate collateral allegedly received by it upon its purchase of the motel, we agree with Great American's reply to this point that our opinion disposed of the argument. When, at trial, Great American introduced its foreclosure sale bid as evidence of the value of the assets at that time, it was incumbent upon appellants to produce contrary evidence on value. Great American points out that no one contended at the trial that the "non-real estate" assets should have been carved out of the Thunderbird and valued separately at trial.
In its motion for rehearing, Great American submits that this court overlooked or misapprehended points of fact and law in concluding that the trial court erroneously ordered reimbursement for 1980, 1981 and 1982 real estate taxes. In doing so, Great American merely re-argues the same positions it asserted in its brief, which positions were rejected by this court in its opinion.
Based on the foregoing, the motions for rehearing are DENIED.
SHIVERS, C.J., and BARFIELD, J., concur.
NOTES
[1] The pertinent portions of the February guaranty contract are set forth in full below:

WITNESSETH:
WHEREAS, Provident [Great American] has agreed to loan the sum of Three Million Five Hundred Twenty-Five Thousand Dollars ($3,525,000) to Thunderbird, Ltd., a Florida Limited Partnership, ("Borrower") pursuant to a Loan Agreement ("Agreement"), and evidenced by two Notes, one in the amount of Two Million Seven Hundred Twenty-Five Thousand Dollars ($2,725,000) and a second Note in the sum of Eight Hundred Thousand Dollars ($800,000), both of which are secured by a Mortgage, Security Agreement, Pledge Agreement and Conditional Assignment of Income ("Security Documents"); and
WHEREAS, to induce Provident to make the Loan the Guarantors have agreed to guaranty the payment of the Eight Hundred Thousand Dollar ($800,000) Note ("hereinafter referred to as the "Note"), including principal and interest, and any other charges provided for in the Note, Agreement and Security Documents, and the performance by Borrower of all of the covenants on its part to be performed and observed pursuant to the provisions thereof;...
NOW, THEREFORE, in consideration of the making of the Loan, and for other good and valuable considerations, the Guarantors, jointly and severally:
.....
(4) Agree that this Guaranty may be enforced by Provident without first resorting to or exhausting any other security or collateral and without first having recourse to the Note or any of the property covered by the Security Documents through any sale, foreclosure proceedings or otherwise; provided, however, that nothing herein contained shall prevent Provident from suing on the Note with or without making the Guarantors a party to the suit, or commencing a suit to foreclose the Security Documents, or any of them, or from exercising any other rights thereunder, and if such suit, foreclosure or other remedy is availed of only the net proceeds therefrom, after deduction of all charges and expenses of every kind and nature whatsoever, shall be applied in reduction of the amount due on the Note, Agreement and Security Documents. Provident shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of payment hereunder or enforcement hereof, and the inability or failure of Provident to obtain or to be entitled to a deficiency shall in no way relieve Guarantors of their liability and obligations hereunder. At any sale of the security or collateral for the indebtedness or any part thereof whether by foreclosure or otherwise, Provident may at its discretion purchase all or any part of such collateral so sold or offered for sale for its own account and may apply against the balance due under the Note, Agreement and Security Documents, the amount paid or credited to Provident from any such sale.
[2] Additionally, the Brownings argue that the language in paragraph (4) is ambiguous and should therefore be construed against the drafter and in favor of the guarantors. The general rule is that "an agreement of guaranty is construed against the party who prepared or presented same," Miami National Bank v. Fink, 174 So.2d 38 (Fla. 3d DCA 1965). However, we simply do not perceive there to be an ambiguity in the disputed paragraph.
[3] During oral argument, and by way of a "Motion to Supplement the Record," the Wilsons raised an objection to the trial court's award of 1984 real estate taxes. However, as this point was not raised below, we will not entertain it on appeal. See Walker v. Hampton, 235 So.2d 325 (Fla. 1st DCA 1970).
[4] Within their argument for the pro rata allocation of the foreclosure proceeds, the Wilsons urged the court to pro rate the attorney's fees and costs as well. Because of our holding in favor of Great American under Point II, however, we need not address the merits of the Wilsons' position on this point.
[1] See footnote 2, supra.