572 So.2d 548 (1990)
MEDICAL CENTER HEALTH PLAN, Appellants,
v.
Ricky BRICK, Appellee.
No. 89-2934.
District Court of Appeal of Florida, First District.
December 14, 1990.
*549 James M. Wilson, of Harrell, Wiltshire, Swearingen, Wilson & Harrell, P.A., Pensacola, for appellants.
Walter A. Steigleman, Law Offices of Walter A. Steigleman, P.A., Fort Walton, for appellee.
PER CURIAM.
Appellant Medical Center Health Plan (Plan), an HMO, challenges the trial court's interpretation of its agreement with appellee Brick as requiring the Plan to pay unilaterally incurred and uncovered medical expenses. The Plan contends that medical services incurred by Brick fall outside the four corners of their HMO agreement. We affirm in part, reverse in part, and remand.
In 1986, Brick's employer offered its employees the option of obtaining medical care through an HMO, the Plan, or through a regular group health indemnity policy. Brick opted for the Plan and admitted at hearing that: (1) he participated in an orientation at which he was expressly informed that the Plan was an HMO, not an insurance company, which would pay medical expenses if (a) a participating physician provided treatment, (b) a "primary care physician" (PCP) authorized treatment, or (c) "emergency" treatment was provided; (2) that he received a copy of the parties' Group Health Services Agreement (agreement) containing these restrictions at an orientation; and (3) that he read a question and answer booklet and other materials which stated in pertinent part:
Except for emergencies, you will see your [Plan] physician for all medical needs. Appointments will be made through his office, and he will arrange for any other consultations or treatments you may need.
In February 1987, Brick sustained neck injuries in an automobile accident. He received emergency medical care for which the Plan paid. He sought follow-up care from Dr. Thigpen whose bills were also paid because Dr. Thigpen was the PCP. Dr. Thigpen referred Brick to a neurologist, Dr. Miller, whose bills were paid because he was an authorized "referral physician". At this point, it appears that Brick thought that he had fully complied with the dictates of the agreement.
Conflicting testimony indicates that Brick thereafter unilaterally sought unauthorized chiropractic care from Dr. Fulford. PIP paid most of the medical bills associated with that chiropractic treatment, the Plan did not pay the balance, nor has Brick sought such payment from the Plan. Because of Brick's worsening condition, Dr. Fulford referred him to Dr. Witkind, a neurosurgeon and non-participating physician. Dr. Witkind treated Brick at Humana Hospital, a non-participant facility. The Plan disputes the medical bills Brick incurred for treatment by Witkind at Humana.
Dr. Witkind first examined Brick in April 1987, and performed a CT scan, a myelogram and a post-myelogram CT scan which revealed that he needed surgery to remove a disk from his neck. Brick was admitted to Humana Hospital six days later and Dr. Witkind performed an anterior diskectomy and fusion. Brick incurred bills of over $5,000 with Humana Hospital and over $3,000 with Dr. Witkind, of which Brick personally paid $1,200. A choking incident at home aggravated his neck in May, and rather than reporting to a local participant hospital, Brick reported to the Humana Hospital emergency room 45 miles away. The Plan also disputes the charges stemming from this second admission, based upon Brick's "self-referral  Primary physician not aware of illness or admission" and because Dr. Hodnette stated that a rule violation occurred in by-passing the nearest emergency room. On cross-examination, the doctor admitted it was an unwritten rule not stated in the agreement but arising from his own interpretation of an "emergency". On redirect, Dr. Hodnette testified that whether Brick stopped at the nearest hospital or not, if it's an emergency it's covered just for the emergency.
A third incident occurred in which Brick had a choking seizure and he was hospitalized again at Humana. The Plan did not contest the initial emergency admission at a local hospital, because it met the definition of an "emergency" but contested the *550 participant doctor's referral from that hospital to Dr. Witkind. Brick incurred expenses of $2,016.74 for the third admission. The Plan denied payment for this admission because of "self-referral" and because it was related to some "emotional problem" not considered by Dr. Hodnette to be part of the emergency.
Testimony adduced at hearing in February 1989, indicated that: (1) had Dr. Witkind been a participating physician, he would have been paid a lesser fee than usual for the particular type of operation performed; (2) except in emergencies, nonparticipant physicians and hospitals may not treat plan members without prior approval; (3) Mrs. Brick presented her membership card and listed the Plan as secondary coverage to Humana Hospital admissions; (4) neither Dr. Witkind or Humana contacted the Plan; (5) Mrs. Brick testified that, prior to the third incident, an approved doctor sent them to Dr. Witkind; (6) subsequent to incurring the disputed medical bills, the Bricks met with a Plan administrator, Dr. Hodnette, to discuss the controverted bills; (7) after they were informed that the bills would not be paid Mrs. Brick became very upset and Dr. Hodnette allegedly represented that all disputed bills would be paid if Brick switched to a participant physician.
Dr. Hodnette testified to the contrary that he had no authority to make the commitment alleged by the Bricks and had never told them the bills would be paid. He told them only that the emergency care incurred in the third incident would be paid, that he would accumulate all information for Board consideration, and that future bills incurred would only be paid if Brick switched to the Plan's neurosurgeon, Dr. Raymon. After Mr. Brick apprised him of his condition, Dr. Raymon initially refused to take him because he felt Brick could only receive safe care if it was rendered by the same doctor and he referred Brick back to Dr. Witkind. However, following a call to Dr. Raymon made by Dr. Hodnette, Dr. Raymon agreed to treat Brick who has had another operation and has returned to work.
Brick disclosed that he knew his PCP or personal physician was Dr. Thigpen. Thus, he knew that, under the clear and unambiguous terms of the agreement, except in cases of emergencies, he had to see Dr. Thigpen before incurring any medical services and that he could only receive payment of associated expenses from another doctor after first obtaining a referral from Dr. Thigpen. However, Brick's testimony at hearing provides some insight into his misconstruction of the terms of his agreement:
The way I understood the plan was once you were referred by your primary physician, it was all covered then. I did not understand about each and every doctor having to refer it or going back to your primary physician.
In August 1988, Brick filed a complaint for declaratory obligated to pay certain medical bills. After hearing in February 1989, the court entered final judgment and found:
(1) Dr. Witkind and Humana are not Plan participants. (2) They failed to comply with Plan requirements of prior approval to obtain compensation for non-emergency treatment. (3) With one exception, treatment rendered was not emergency treatment as defined by the Plan. (4) Treatment was not properly rendered on referral from the Plan's PCP or any other participating physician. (5) Brick, in good faith reliance upon information provided, assumed medical treatment he sought was covered by the Plan. (6) Treatment rendered was, in fact, reasonable and medically necessary. (7) The Plan is not in any way prejudiced by being required to pay for these reasonable and necessary medical services provided that payments to the non-participants is commensurate with payments which would have been made to participants.
The court ordered the Plan to pay the emergency room treatment conceded, directed it to pay medical services rendered by nonparticipants and reserved jurisdiction to assess costs. At rehearing in August *551 1989, the court explained that it "wrestled with this case at some length" in reaching its judgment as follows:
... [T]he court felt that there was evidence that there could have been a belief on the part of the plaintiffs that there had been representations made to them that the services were going to be covered. Secondly, there was evidence to support that Mrs. Brick had been referred to  I should have been more elaborate at the time I drafted this order because she went to a doctor in Milton who sent her to a doctor somewhere else. Somewhere along the line  it seems like Dr. Thigpen here maybe to start with  and then doctor so and so in Milton sent her to a  ... You know, at some point in time, in the applications of these complicated legal documents wherein people are taking premiums and charging fees, there is a responsibility on the part of the one that's collecting the moneys and providing the agreement to cover services, that they don't make it so damned unreasonable to have to figure it out  sit down and read the contract each time they go to the doctor. And they [Bricks] did within reason what I would expect a reasonable and prudent person to do. And they were referred by a contract employee or provider to a noncontract provider. And at some point in time, you follow the doctor's advice and you don't sit down and read the contract. And I think that the Bricks did everything that could be reasonably expected of them. And I agree that I am parting from a strict construction of the contract. I'll put that on the record for appeal so that you have that. But I am of the opinion that the plaintiffs did everything that could reasonably be expected of them under this contract and that they are entitled to the coverage that's afforded them... .
In September 1989, the court denied appellant's motion for rehearing.
A party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract. Nat'l Health Laboratories, Inc. v. Bailmar, Inc., 444 So.2d 1078, 1080 (Fla. 3d DCA), review denied, 453 So.2d 43 (Fla. 1984). See generally Bingemann v. Bingemann, 551 So.2d 1228 (Fla. 1st DCA 1989), review denied, 560 So.2d 232 (Fla. 1990). It is not the role of the courts to make an otherwise valid contract more reasonable from the standpoint of one contracting party. Stack v. State Farm Mut. Auto. Ins. Co., 507 So.2d 617, 619 (Fla. 3d DCA), review denied, 515 So.2d 230 (Fla. 1987). A declaratory judgment is not available to settle factual issues bearing on liability under a contract which is clear and unambiguous and which presents no need for its construction. New Amsterdam Cas. Co. v. Intercity Supply Corp., 212 So.2d 110 (Fla. 4th DCA 1968).
The real question presented by Brick in his suit for declaratory judgment is factual, namely, whether Brick's action in seeking non-emergency, non-participant medical services without referrals from either Dr. Thigpen or another Plan doctor complies with the specific, clear and unambiguous requirements of the agreement. Restated, the issue is the application of clear policy exclusions to the factual circumstances. Our review of the agreement at issue reveals it is clear and unambiguous in requiring Brick to obtain a referral from Dr. Thigpen or a PCP before seeking initial non-emergency treatment from another doctor. This Brick failed to do prior to his first admission and diskectomy in April 1987.
No competent substantial evidence shows that Dr. Thigpen referred Brick to Dr. Fulford, a non-participant chiropractor. Brick did not comply with the terms of the agreement, of which he admits knowledge, by obtaining a referral from Dr. Thigpen to see Dr. Fulford. It was only upon his unilateral mistake and Dr. Fulford's unauthorized referral that Brick enlisted Dr. Witkind's treatment. Since the April 1987 operation was not to be performed until six days after the diagnostic visit, no "emergency" was reasonably apparent to justify non-participant treatment for the first admission. Thus, the consult, diagnostic treatment, surgery and hospital bills associated with Brick's first admission were all *552 incurred outside the four corners of Brick's agreement.
The trial court's findings do not distinguish between the three separate treatments and admissions but recognize that Brick sought unilateral non-emergency treatment from an unauthorized non-participant doctor and hospital, that these non-participants failed to acquire prior approval and that no Plan participant referred Brick to Dr. Witkind and Humana Hospital. Given these findings and Brick's failure to allege that the contract is invalid, we find no competent substantial evidence to support the trial court's ruling in Brick's favor with respect to the services provided by Dr. Witkind and Humana Hospital in the circumstances surrounding his first admission. However, the agreement is somewhat ambiguous regarding circumstances which would support an "emergency". The record shows extrinsic facts which left Brick in doubt regarding coverage in "emergency" circumstances. We find competent substantial evidence to support coverage of the second and third admissions and treatment from non-participants because Brick either had an "emergency" or because he received a referral from a participating physician. Thus, the trial court properly ruled in Brick's favor with respect to the medical bills in the circumstances surrounding his second and third admissions.
Absent any duty under the contract or any detriment, we find no merit in appellee's estoppel or waiver arguments. See Crown Life Ins. Co. v. McBride, 517 So.2d 660 (Fla. 1987); South Investment Corp. v. Norton, 57 So.2d 1 (Fla. 1952); Raymond v. Halifax Hosp. Medical Center, 466 So.2d 253 (Fla. 5th DCA 1985); Southeastern Sales & Serv. Co. v. T.T. Watson, Inc., 172 So.2d 239 (Fla. 2d DCA 1965).
Therefore, we AFFIRM in part, REVERSE in part, and REMAND.
ERVIN, WENTWORTH and MINER, JJ., concur.