732 So.2d 472 (1999)
TOYOTA TSUSHO AMERICA, INC., Appellant/Cross-Appellee,
v.
Earl M. CRITTENDEN and A.E. Langley, et al., Appellees/Cross-Appellants.
No. 98-1803.
District Court of Appeal of Florida, Fifth District.
May 21, 1999.
*473 Jon E. Kane and David M. Landis of Mateer & Harbert, P.A., Orlando, for Appellant/Cross-Appellee.
Roland A. Sutcliffe, Jr., and J. Timothy Schulte of Zimmerman, Shuffield, Kiser & Sutcliffe, P.A., Orlando, and J. Lester Kaney of Cobb, Cole & Bell, Daytona Beach, for Appellee/Cross-Appellant.
ANTOON, J.
In this breach of contract action, the trial court entered a final judgment in favor of Toyota Tsusho America, Inc., (Toyota) and against appellees, Earl M. Crittenden and A.E. Langley. Toyota appeals the judgment arguing the trial court erred in ruling that 1) the proceeds derived from the liquidated collateral which secured appellees' promissory note must be credited to the recourse portion of appellees' debt; and 2) the appellees are entitled to receive a $200,000 set off against the final judgment entered in favor of Toyota. Appellees cross-appeal contending that the trial court erred in establishing July 20, 1995 as the date they defaulted on the parties' contract. Each of these issues possesses merit.[1]

FACTS
The relationship between the parties began in 1990 as Toyota was becoming involved in Florida's citrus industry. Toyota offered to purchase from appellees a citrus processing plant as well as numerous acres of citrus groves. An agreement was reached between the parties; however, at some point, the deal fell through and appellees sued Toyota seeking enforcement of the agreement. The matter went to mediation.
In June 1994, the parties reached what has been characterized as a "global" settlement agreement. The terms of the agreement required the parties to execute several documents including a promissory *474 note, a consulting agreement, a noncompete agreement, a mortgage agreement, and a pledge agreement. Relevant to this appeal, all of the documents comprising the global settlement agreement contained cross-default provisions whereby a default on any one agreement constituted a default on all of the other agreements.
The global settlement agreement provided, among other things, that Toyota would buy appellees' ownership interests in a juice processing plant in exchange for appellees' reimbursement to Toyota in the sum of $11,718,548; a sum which apparently represented the amount Toyota had invested in the appellees' businesses prior to execution of the global settlement agreement. A promissory note was signed by appellees to evidence the payment terms for their $11,718,548 obligation. Of particular importance, the terms of the note specifically provided that appellees' joint personal liability (i.e., the recourse portion of the debt) was limited to one-half of the outstanding debt owed on the note. The global settlement agreement also included a consulting agreement pursuant to which Toyota agreed to pay appellees to consult with the corporation for a period of two years.
As security for the promissory note, appellees executed second mortgages in favor of Toyota on two citrus groves which they owned; namely, the Fort Pierce Groves Partnership and the Holopaw Groves Partnership (partnership groves). The second mortgages were junior to first mortgages held by the Equitable Life Assurance Society of the United States (the Equitable). Any default by appellees on the Equitable's first mortgages constituted a default on the parties' global settlement agreement. As additional security for the note, appellees executed a document pledging their partnership interests in the "West McCoy Citrus Partnership."
In February 1995, the Equitable commenced actions against appellees to foreclose on the partnership groves. As a junior lien holder on the properties, Toyota was named as a party to both foreclosure actions. In November 1995, Toyota requested that appellees fund Toyota's defense of the foreclosure actions since such funding was required under the terms of the global settlement agreement. After appellees refused, Toyota ceased making payments to appellees under the parties' consulting agreement. On December 1, 1995, appellees failed to make the first installment which was due on the $11,718,548 promissory note. Twenty days later, the Equitable's foreclosure proceedings were stayed because the partnership groves filed petitions for protection under Chapter 11 of the Bankruptcy Code. The next day, Toyota sent notice to the law firm which was holding in escrow appellees' interest in the West McCoy Citrus Partnership demanding delivery of appellees' partnership interests. The law firm responded by filing an interpleader action. In response to the complaint in interpleader, Toyota filed a cross-claim against the appellees seeking damages allegedly sustained by Toyota as a result of the appellees' breach of the parties' global settlement agreement.
On October 30, 1996, the trial court entered an order directing the circuit court clerk to deliver to Toyota the West McCoy Citrus Partnership interests which were being held in escrow, and the court also authorized Toyota to dispose of the interests. Toyota conducted a public sale and was the highest bidder at the sale, purchasing the partnership interests for $2,600,000.
In November 1996, the United States Bankruptcy Court entered an order confirming the Equitable's plan for liquidation whereby ownership of the partnership groves was transferred from the appellees to the Equitable. This transfer of ownership rendered moot the Equitable's pending foreclosure actions and therefore the actions were dismissed. In further settlement of the bankruptcy action, Toyota received a distribution of $1,000,000 on its secured claim and $15,792.56 on an unsecured *475 claim. Toyota's second mortgages on the partnership groves were thereby extinguished.
Finally, in July of 1997, the matter went to trial on the law firm's interpleader complaint; the sole claim remaining by that time was Toyota's cross-claim against appellees for breach of the global settlement agreement. In resolving this issue, the trial court determined that default on the parties' agreement occurred on July 20, 1995, the date Toyota forwarded its first notice of default to appellees. The court awarded Toyota $4,788,010.71 in damages subject to a $200,000 set off in favor of the appellees. The court also ruled that the proceeds which Toyota had already received as a result of its liquidation of the collateralized assets must be credited to the recourse portion of the appellees' debt.

APPEAL
Toyota contends the trial court should have ruled that the proceeds which Toyota received as a result of its liquidation of the collateralized assets must be credited to the nonrecourse portion of the appellees' debt. We agree.
The liquidation of the assets which secured appellees' promissory note yielded Toyota a sum of $3,615,792.56. This sum represents the total of $1,015,792.56, which was received by Toyota in settlement of its second mortgage claims against the partnership groves when those claims were discharged in bankruptcy, and $2,600,000, which was derived from the sale of appellees' interests in the West McCoy Citrus Partnership. The trial court ordered the $3,615,792.56 to be credited against the recourse portion of the appellees' $11,718,548 debt. In reaching this conclusion, the trial court considered various provisions set forth in the mortgage agreement as well as the promissory note. The court concluded that the various provisions, when read together, are either ambiguous or silent on the allocation issue; stating that the contractual language "implies" that the proceeds derived from liquidation proceedings must be credited to the recourse portion of the debt. We disagree.
The mortgage agreement specifically and clearly provides that all proceeds derived from "foreclosure sale" or "deed in foreclosure" must be credited to the nonrecourse portion of the debt. The promissory note also addresses the issue of recourse, providing:
This provision shall not be construed to limit the recourse of Lender against the property securing the indebtedness evidenced hereby. Recourse against the said property may be had for the full amount of the indebtedness evidenced by this Note.
The trial court determined that, pursuant to these provisions, proceeds derived from liquidation proceedings could not to be applied to the nonrecourse portion of the debt because the language in the mortgage agreement referred only to proceeds from "foreclosure sale" and "deed in foreclosure". This reasoning is strained and, if followed, could lead to the untenable result whereby a debtor could reduce his personal liability by avoiding foreclosure and seeking relief in bankruptcy court. More importantly, this interpretation improperly rewrites the clear and unambiguous terms of the parties' contract. See Medical Center Health Plan v. Brick, 572 So.2d 548, 551 (Fla. 1st DCA 1990). Furthermore, the language of the promissory note at issue, while allowing Toyota to seek recourse against the collateral, is not inconsistent with the provisions in the mortgage agreement which state that all proceeds derived from a foreclosure sale or a deed in foreclosure must be credited against the nonrecourse portion of the debt. See Prestige Rent-A-Car, Inc. v. Advantage Car Rental and Sales, Inc., 656 So.2d 541, 544 (Fla. 5th DCA 1995)(noting that an interpretation of a contract which gives a reasonable meaning to all terms is preferred).
Moreover, even if we were to agree with the trial court's conclusion that the global *476 settlement agreement is silent with regard to the allocation of proceeds derived from liquidation proceedings, our conclusion that such proceeds must be credited to the nonrecourse portion of the debt would remain the same. In reaching this conclusion, we are persuaded by the rulings in Consolidated Naval Stores Co. v. Wilson, 82 Fla. 396, 90 So. 461 (1921), and Thunderbird, Ltd. v. Great American Insurance Co., 566 So.2d 1296 (Fla. 1st DCA 1990). The courts in both cases explained that there are two circumstances where the proceeds from liquidation proceedings must first be applied to the recourse portion of the debt: 1) when there is such an express agreement between the parties; and 2) when the guarantor has agreed to be the security for a limited part of the debt and the purpose of that limited indorsement is not to afford additional security to the debt. Thunderbird, 566 So.2d at 1300. See also Consolidated Naval Stores, 90 So. at 465. We extend this ruling to include cases wherein a maker of a note expressly agrees to limit his personal liability by stating that the proceeds derived from liquidation proceedings must be first credited against the recourse portion of the debt. Our review of the instant record reveals that the appellees failed to submit competent evidence that such an agreement was reached by the parties in this case. Accordingly, we must reverse the trial court's ruling on this issue. On remand, we direct the trial court to credit the proceeds received by Toyota from the liquidation of the collateralized assets to the nonrecourse portion of the appellees' debt.
Toyota also contends that the trial court erred in awarding appellees a $200,000 set off against the final judgment. In granting the set off, the trial court found that Toyota's decision in November 1995 to cease making payments pursuant to the parties' consulting agreement constituted a breach of the consulting agreement. In so ruling, the trial court concluded that the parties' consulting agreement constituted an obligation which was independent from the parties' global settlement agreement and therefore Toyota's breach of the consulting agreement entitled appellees to receive an award of damages. We again disagree.
The parties' consulting agreement provided that appellees would work for Toyota as independent contractors for a period of two years. Pursuant to the agreement, appellees were to serve as good will ambassadors for Toyota, working at least 600 hours per year. In consideration for these services, appellees were to receive a total of $150,000 each, paid in equal monthly installments over the two year period. Other relevant terms of the agreement related to default and to the payment to the appellees' survivors should the appellees die during the two-year contract period. With regard to survivorship, the contract provided that "[i]n the event of [appellees's] death during the two (2) year time ... compensation shall be continued and paid to such beneficiary or beneficiaries." The default provision provided:
9. Default: Any default in performance of any of the terms and conditions of this agreement or the occurrence of any one or more of the following events or conditions shall constitute a default by [appellees] hereunder, to wit:
* * *
(ii) Default and obligations of A.E. Langley, Earl M. Crittenden, Fort Pierce Groves Partnership, Holopaw Groves Partnership (collectively "makers"), as evidenced by a promissory note of even date herewith from makers to Silver Springs Citrus Cooperative in the original principal amount of $4,349,273.83, which has been assigned to Toyota Tsusho America, Inc., in a promissory note of even date from makers to Toyota Tsusho America, Inc., in the original principal amount of $7,366,274.17, which notes have been consolidated with the promissory note of even date herewith *477 to Toyota Tsusho America, Inc., in the original principal amount of $11,715,548 (collectively "the promissory note").
Both appellees survived all events relevant to the trial and this appeal.
Toyota forwarded the monthly payments to appellees in accordance with the terms of the consulting agreement through October 1995. At trial Toyota, through its agent, testified that it decided to stop making payments to appellees in November 1995 because by that time Toyota had received a letter from the Equitable which notified Toyota that the appellees had elected to surrender ownership of the partnership groves to the Equitable in settlement of their defaults on the first mortgages held by the Equitable. Toyota maintained that, pursuant to the cross-default provisions contained in the global settlement agreement, appellees' defaults on the first mortgages held by the Equitable constituted a default against Toyota in the global settlement agreement which relieved Toyota of its obligation to continue making monthly payments in accordance with the consulting agreement.
When a nonbreaching party to a contract is confronted with a breach by the other party, the nonbreaching party may stop performance, treating the breach as a discharge of its contractual liability. See Bradley v. Health Coalition, Inc., 687 So.2d 329, 333 (Fla. 3d DCA 1997). Thus, once appellees breached any of the terms of the global settlement agreement, Toyota was entitled to treat the breach as a discharge of its contractual obligation to make payments under the parties' consulting agreement. Contrary to the trial court's ruling otherwise, the consulting agreement was not an "independent obligation," but instead, an integral part of the parties' global settlement agreement. We are not persuaded otherwise by the provision providing for payment to appellees' survivors should appellees die before the two-year contract period expired. Had there been no breach and appellees had died during this period perhaps their estates would have had a valid claim for the unpaid balance due under the contract. However, those are not the facts before us. In any event, the ruling authorizing the $200,000 set off must be reversed because Toyota was entitled to cease making payments under the parties' consulting agreement once the appellees breached the terms of the global settlement agreement.

CROSS-APPEAL
In its final judgment, the trial court set forth findings of fact outlining a chronology of events relevant to the determination of the date the appellees defaulted on the global settlement agreement. Based upon these findings, the trial court concluded that the date of default was July 20, 1995, the date Toyota sent appellees the first notice of default. On cross-appeal, appellees argue that default did not occur until December 1, 1995, the date when the appellees failed to make the first payment due on the promissory note. We agree.
The documents comprising the global settlement agreement describe events which would constitute default. For example, breach of appellees' first mortgage obligation to the Equitable would constitute a default, but the mere filing of a foreclosure complaint was not listed as such an event. The foreclosure complaints filed by the Equitable alleged material breaches of the appellees' first mortgages. If proven, such breaches would have constituted a breach of the parties' global settlement agreement. However, the Equitable's complaints were not verified and mere allegations contained in unsworn pleadings are not evidence. See Coggan v. Coggan, 239 So.2d 17, 19 (Fla.1970). Similarly, entry of a final judgment in the Equitable's foreclosure actions would have determined the exact date of appellees' default; however, such a judgment was never entered because the foreclosure actions were rendered moot by the bankruptcy adjudication. Apparently, the date of appellees' default on the first *478 mortgages was not established in the bankruptcy proceeding either since the trial court did not make reference to such a finding.
There not being a judicial determination in either the foreclosure or bankruptcy actions establishing the date of appellee's default on the Equitable mortgages, we must look to the instant record for such a date. Our review of the record evidence does not support the trial court's determination of July 20, 1995, as the default date. Instead, the evidence of record demonstrates that the first event constituting a default by appellees under the terms of the parties' global settlement agreement occurred on December 1, 1995, when the appellees failed to make the first payment due on the promissory note.

CONCLUSION
We reverse the trial court's rulings with regard to set off and date of default and remand this matter to the trial court for a redetermination of damages. In recalculating the damages, the trial court is authorized to determine the amount, if any, of set off for the period of time between the date of Toyota's last payment made to appellees under the consulting agreement and December 1, 1995, the date of appellees' default on the global settlement agreement. Also, the proceeds derived by Toyota from the liquidation of the collateralized assets must be credited to the nonrecourse portion of the debt.
AFFIRMED in part; REVERSED in part; and REMANDED for further proceedings.
COBB and GOSHORN, JJ., concur.
NOTES
[1] We summarily reject as meritless appellees' claim of error regarding the trial court's calculation of prejudgment interest.